RECEIVED

NOV 10 2026

Wendy R Oliver, Clerk
U.S. District Court
W.D. OF TN, Memphis

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE WESTERN DISTRICT OF TENNESSEE**

**WESTERN DIVISION**

---

**PAUL MILEM**

**PLAINTIFF,**

**CIVIL ACTION NO.:**

**vs.**

**JUDGE KATHLEEN GOMES**
**PROBATE COURT JUDGE 30TH JUDICIAL DISTRICT**
**ELDER CARE CONSULTANTS LLC**
**Edward Autry Appointed Administrator of the Estate of David Milem**
**DEFENDANTS**

---

**COMPLAINT**

---

1. Plaintiff is a citizen of the United States and a resident of Memphis, Shelby County, in the Western District of Tennessee.
2. One Defendant is the Judge of Probate Court of Shelby County, and the other is an LLC Appointed by the Judge in her official capacity.
3. This action is brought under the provisions of the 14th amendment Due Process Clause that protects a family's fundamental right to integrity and autonomy from unwarranted State interference.
4. Plaintiff's father was removed from his care and placed in the care of Elder Care LLC by the Defendant Judge without any notice or hearing. The Plaintiff is his only Child. The TCA 34-1-132 allows the appointment on an Emergency basis if a Sworn petition is filed that the respondent will be substantially harmed and a hearing should be had 5 days after the appointment if done. In the instant case no Sworn Petition was ever filed, and no hearing was ever conducted. The court

proceeded to allow Elder Care to keep the Plaintiff from having access to his father for an extended period of time. Once the Police came to pick up Plaintiffs Father from his home is how he and his father was made aware of the appointment without notice to him or his father. Plaintiff later found out it was because of an accounting issue which was later accounted for in a hearing requested by the Plaintiff to be appointed as his father's Conservator which was adamantly denied by the Court. The Plaintiff had never been accused of any Mistreatment of his father. When the Judge in the instant case acted outside of the Statute that Governs Appointment of Conservators, she acted outside of her authority and thereby waived any Judicial immunity. Further the Judge Gomes has ordered respondents home to be sold and actually sold the Respondents' Building to the same parties she has sold other Probate properties to in the last few years. While acting as if the property sells are to anonymous buyers. Upon research and belief, the Judge has failed to maintain an appearance of impropriety by appointing Elder Care in other cases and selling Properties Of other respondents in which Elder Care is the Conservator in order to pay fees of Elder Care Lawyers and Elder Care LLC. The Judge in fact has abused her discretion. The Judge has told Plaintiffs former Attorney how she did not like the Plaintiff and his former Attorneys where incompetent. (Plaintiff has recordings) Elder Care has denied access to Plaintiffs father and also informed Care Givers to not inform the Plaintiff of his father's medical condition. Elder Care has created astronomical fees to care for his father and authorized their

Attorneys to build up fees in their behalf to maintain Plaintiffs Father in their Custody even paying for extra sitters in Nursing facilities to spend all proceeds from the sale of the respondents Building and only looking into his Veteran benefits when they spent over $250,000 in a year. All applications to take care of his Father have been denied denying Plaintiff his Familial association. To protect and take care of his father.

5. Plaintiff's application was denied initially to be his father's Conservator was denied because of his inability to be bonded and upon reconsideration and bondable person joining in on the petition was ignored by the court in order to keep Elder Care on the case. Upon timely making request for the Judge to recuse herself which she refused. The Judge continued the Unlawful Appointment of Elder Care and in Open Court admitted she was responsible for the Appointment of Elder Care although violating TCA 34-3-103 and failing to give Plaintiff notice of the Appointment and denying him Due Process. The actions of both the Judge and Elder care fail as fiduciaries acting in the best interest of Plaintiffs father. The Plaintiffs father has suffered many injuries and hospitalizations while in the care of Elder Care and failed to inform Plaintiff. The court has removed all witnesses from the court who came to support the Plaintiff on every occasion violating Judicial Conduct Rule 2.6 ensuring a right to be heard. When banning the witnesses the Judge displayed Hostile behavior recognized by all present and Bias against the Plaintiff and his witnesses. After many hearings Always allowing Elder Care to be heard first even though the Plaintiff was the Petitioner and not allowing him to put on his proof. The Plaintiff has

exhausted all remedies in the State Courts filing Judicial Complaints Appeals of the rulings and all have been rejected.

6. Plaintiff was recently found in both Civil and Criminal Contempt and was never served denying him his Due Process rights and the Court entered an order to sale Plaintiffs Fathers home although he is in A veteran Facility in which his monthly income can pay for. The Sale of the home is to pay astronomical Attorney fees of Elder Care Lawyers and Elder Care. The Plaintiff has exhausted all remedies.

7. The finding of the Court that the Plaintiff was not able Or entitled to be the Conservator of his Father after taking care of him solely for 2.5 years after being diagnosed with dementia was not based on substantial evidence to the contrary. Plaintiffs father has died while in the care of Elder Care with no notice of his failing condition to Plaintiff.

8. In reaching such decision to Appoint Elder Care, the Defendant Judge Gomes committed numerous errors of law and constitutional violations of Plaintiffs rights and applied incorrect and biases and improper legal standards toward Plaintiff. Plaintiffs father died on October 29th 2025.

Since my Fathers Death the Court refused to appoint Plaintiff as administrator of his Fathers Estate. The Court has since Ordered his family home sold to pay the expenses allegedly left prior to his father's death although my Father was placed in a Veterans home in Mississippi due to a lack of funds because Elder Care used all his funds placing him in some of the most expensive facilities in Shelby county and also paying for sitters while in the homes while he lay unconscious. I am attaching a timeline and info about the bias of the Judge the misuse of Funds of Elder Care and the Appointment of Autry.

Conservatorship and Estate of David Milem

Timeline of Events

| | |
|---|---|
| 2018 | Paul and family moved into home on Stonewall to care for David. |
| 11/13/19 | Petition for conservatorship by Paul (son) and Alice (ex-wife). Guardian ad litem appointed. |
| 12/13/19 | Order appointing Alice conservator only due to Paul's absence from court.<br>• § 34-3-103. Paul had legal priority.<br>• § 34-3-107. The order does not explain why Gomes skipped Paul, or even mention him. |
| 1/15/20 | Inventory Management Plan from Alice. Only listed properties, not Social Security or money owed to him from a lawsuit. Back taxes listed as $28,000. Annual expenses to be $48,840, the amount under which he thrived until Eldercare took over. |
| 2/7/20 | Motion to Amend and Require CDT test. Affidavit stated that Alice was drinking heavily, keeping Paul from David, neglecting David, and making false allegations against Paul. The motion was ignored. |
| 2/17/20 | Gomes approved Alice's Property Management Plan which acknowledged back taxes were owed, but Gomes did not desire or expect them to be paid off all at once. It was understood there was an acceptable payment arrangement set up. |
| 9/2020 | Alice moved out of the house on Stonewall. Paul was sole caretaker for David. |
| 11/16/20 | Petition for New Conservator, co-signed by Alice and Paul, replacing Alice with Paul due to her health. Paul was unable to get bonded at that time, so Alice stayed on.<br>• §34 -1-105. Gomes could have appointed Paul as conservator of person, with attorney Kim Sims as conservator of estate, but she refused due to personal bias against Ms. Sims.<br>• § 34-3-107(4). There was no order stating why Paul was incapable of serving.<br>• § 34-3-108(a,d). Gomes left Alice as conservator despite her affidavit stating she was incapable. Gomes did not write an order answering the petition. |
| 3/18/21 | Memory Clinic Evaluation: "Living Arrangements: Lives with his son Paul Milem. Primary Caregiver and contact info for same: Son(only child) Paul. Other support system: Vet's ex-wife Alice Milem recently became ill and no longer able to assist." |
| 7/15/21 | "SW [social worker] attempted to call Veteran's spouse Alice Milem(P:901-489-0131) and received a message that the number is no longer in service." |
| 10/4/21 | Amended Accounting filed by Alice, showing assets of $60,259.30, expenditures of $51,665,31, and balance of $8,603.99. |

| | |
|---|---|
| 10/12/21 | David was approved by VA for adult day care transfers, Community Nursing Home (CNH) Follow-Up.<br>• As David's Power of Attorney, Paul was working with the VA for David's benefit, unaware that the court did not allow it. |
| 12/15/21 | David approved by VA for community nursing home. Paul was not notified. |
| 5/3/22 | David admitted to hospital after Paul found him unconscious on toilet. "Per Paul would like all interventions and surgeries, treatments for father." "Son states he is deteriorating in his mental status and physical needs. He will need PT recs, probable shower chair and possible assistive device for walking as his weakness has worsened. His son states he goes to daycare three days a week and will be able to come back home after this hospital admission but he would like to talk to SW for placement options as he feels like this decision will need to be made soon." |
| 5/9/22 | "Discharge notes - Family is concerned about recent deterioration and cognitive decline and believe they cannot give him proper care and attention for his current needs at home." "SW notified per Springs of Avalon in W.Memphis, AR that this pt has been accepted for SNF placement using his Medicare benefits." Paul was not notified. |
| 5/13/22 | "Spoke with son, Paul (Advanced Directive), cancelling 5/19 follow up visit, currently in Rehab, states 18 days remaining. Concerns to care for father after discharge. Asked to reach out to Dr. Thomas for suggestions. States present level of care will be 24 hours and feeling guilty about any placement." |
| 8/23/22 | David admitted to hospital for bowel obstruction until 9/1/22. Paul asked about nursing home. Care getting difficult. |
| 10/6/22 | Order Substituting Counsel replacing Kim Sims with Flordia Henderson for conservatorship. |
| 10/7/22 | David in hospital for possible cleaning solution ingestion until 10/22. David approved by VA for community nursing home. Paul asking about hospice. |
| 12/28/22 | Order Substituting Counsel replacing Flordia Henderson with John Bucky Philip for conservatorship.<br>Accounting filed by Alice, prepared by Bucky, showing $158,841.85 assets, $135,092.96 expenditures, $23,748.89 balance. Fraudulent numbers. |
| 1/7/23 | David admitted to VA hospital until 1/17/23. "Mr. Milem, he was curled by his bed in his urine with blue discoloration to bilateral hands and feet and was more confused than usual. In the ED pt arrived hypotensive 108/97 and hypothermic 90.4 F. ICU was called to evaluate patient however pt was stabilized in ED and was appropriate for admission to the floor for AKI, failure to thrive." Diagnosed with sepsis. |
| 1/17/23 | David taken to Springs of Avalon for rehab. |

| | |
|---|---|
| 2/16/23 | Clerk reported Alice overspent $86,252.96, based on Bucky's fraudulent numbers. |
| 3/1/23 | Notice of Hearing on Exceptions to Accounting to Alice and Bucky. It seems that hearing was canceled and Bucky got an extension at the hearing on 3/23. |
| 3/3/23 | David in VA hospital until 3/23/23. Reason for Admission: Falls at home, dementia, need for SNF placement per family request. |
| 3/6/23 | Bucky charged for "Meet with Judge regarding the ability of Ms. Milem to serve; Court moves date up; Instructs phone call to ElderCare." "Emails to Rena with ElderCare."<br>• Ex parte communications between Gomes and Bucky<br>• Again, Gomes ignores the priority list of appointees and fails to notify Paul. |
| 3/8/23 | David approved by VA for community nursing home. Paul was not notified. |
| 3/10/23 | Bucky charged for taking Alice to a hearing. No record of hearing on the docket. Also charged for drafting an order, saying it's approved by Jessica at Eldercare, who was not legally involved yet. |
| 3/14/23 | Paul was summoned to bring lease documents, bank records, and blank checks on 3/21/23, but Bucky never served him, so he was unaware of any activity in the case. |
| 3/22/23 | Doctor filled out forms for nursing home. Social worker submitted a new VA contract because the previous one expired while David was in the hospital. |
| 3/23/23 | David's records showed that Paul was HCPOA, and that David was eligible and authorized for VA to pay for nursing home for long-term care. He was moved to Springs of Avalon. |
| 3/23/23 | Order appointing Eldercare conservator was approved without notice to Paul, and without formal petition for successor conservator. David had $55,000 in the bank. Order required Paul to give Eldercare control and possession of all of David's documents, personal and real property, vehicles, keys. Eldercare paid for their bond with David's money. |
| 3/24/23 | Conservator's Certificate appointed ElderCare. It stated, "Now therefore, the Conservator(s) may execute all powers removed from the Ward and vested in the Conservator(s) by the Court's order in this cause. This includes the power to collect, receive, and manage the monies, property, and effects of the Ward that now or hereinafter become due. To the extent not specifically removed by this Court's order, the Ward may exercise all powers of a person not found to be disabled."<br>• § 34-1-129. No powers were given to ElderCare over David's healthcare. |
| 3/25/23 | David fell out of his wheelchair hitting his head and was seen in the ED. He had a small scalp hematoma, however no fractures were noted so he was sent back to Springs of Avalon. |

| | |
|---|---|
| 4/4/23 | Motion to Amend, seeking to make Paul and Kim Sims the conservator. Paul was still unaware that ElderCare had been appointed. |
| 4/6/23 | Doctor wrote, "Patient is being discharged to SNF for short-term and then ultimate plan is to return home and receive meds from VAMC." David sent to Jonesboro.<br>• Two weeks after their appointment, ElderCare had still not located their ward or spoken to his doctors. Otherwise, they would have known about this plan. |
| 4/7/23 | ElderCare showed up with Memphis Police to take custody of David. Paul wasn't home. Whitney turned them away because David wasn't there. She called Paul. He came home. By the time he got home, they weren't trying to get into the house anymore.<br>• There was no reason for the police to be involved. ElderCare could have simply called and informed Paul about their appointment. |
| 4/7/23 | Jessica Hyte informed doctors, "THE GUARDIAN MUST BE CONTACTED FOR ANY TREATMENT OR PROCEDURES REQUIRING INFORMED CONSENT. Official Court Order available - yes."<br>• This is not accurate according to the Conservatorship Letters. ElderCare was not given the right to determine medical treatments for David, other than the ability to put him in a home. Paul, therefore, as Power of Attorney, would still be the contact for David's healthcare. |
| 4/7/23 | ElderCare banned Paul from visiting his father, without court approval or notifying Paul.<br>• §34 -3-107(2P) David retained the right to see his family.<br>• Nothing in the history of the case implied that Paul was abusive to David. There was no reason for him to be banned from his father. |
| 4/13/23 | Eldercare replaced Bucky with attorney Marjorie Baker. |
| 5/10/23 | Gomes denied the Motion to Amend based on accounting, because David signed his own checks when Alice neglected her duties and Paul had to step in. Gomes promised to revisit the matter once the accounting was sorted, but she never did.<br><br>Paul was prohibited from moving his father, but was finally authorized to visit.<br><br>Paul witnessed Eldercare representative coming from judge's chambers before the hearing, implying ex parte communications.<br>• § 4-5-304. |
| 5/16/23 | David taken to ED for worsening hematoma. "78 yo M with history of atrial fibrillation and dementia presents after reported fall one month ago. His caretaker is present and provides limited history as patient in non-verbal. She does not think he has had any subsequent falls. She does not think this is tender. No other history obtainable."<br>• Jessica Hyte, the ElderCare Conservator of Person, could not answer any questions about David's medical history but refused to let the doctors talk to Paul, his caretaker for many years. She also claimed that David was non-verbal, which was not true. |

5/16/23 David admitted into hospital. "He currently resides at Springs of Avalon and is under a conservatorship. His guardian, Jessica Hyte, was called and provided the history. She says he has had a worsening black eye within the past 3-4 days. In the meantime, he was admitted to the ICU at Northeast Arkansas in early April for acute encephalopathy secondary to a UTI and hypernatremia with a Na 170s. Ms. Hyte has not seen Mr. Milem in about a month or so but says that physical therapy has noted improvement in his functional and mental status. The last time she saw him, he was oriented to self only and was able to follow simple commands." "He was evaluated by ENT who performed a bedside drainage of the hematoma. Patient is being admitted to medicine for observation until ENT can re-evaluate the patient on Thursday." (5/18)

- Almost two months into the conservatorship, and Jessica Hyte had only seen David one time.

5/16/23 "DECISION-MAKING CAPACITY TO MAKE DECISIONS ABOUT LIFE_SUSTAINING TREATMENTS. Patient does not have capacity to make decisions about LSTs ;LST plan written based on discussion with surrogate.
HEALTH CARE SURROGATE'S NAME AND CONTACT INFORMATION
Guardian(s) (named by a court of law) Name and Contact Information: Jessica Hyte 662-469-1476."

- § 34-3-107. Jessica Hyte had never had a conversation with David, yet she made decisions about his life-sustaining treatments, without asking Paul what his father wanted. She refused all life-sustaining treatments. David retained the right to make end of life decisions according to the Conservatorship papers.

5/18/23 "SW received a call from Jessica Hyte (pt. guardian) with Elder Care Consultants (662-469-1476) regarding discharge planning. Jessica reports she wants the pt. to return to the Springs if the facility will accept him back. Jessica reports the pt. payer source is private pay."

- David was approved for the VA nursing home, but Jessica called the nursing home and said he was private pay. She made the decision to send him back without consulting with his doctors or anyone who knew him.
- Arkansas § 28-74-401 and 403. According to Arkansas law, she needed AR Court approval to operate as conservator in that state. There is no record of her seeking or receiving this approval.

5/22/23 "On repeat ENT evaluation, patient deemed medically stable for discharge back to The Springs of Avalon. Discharge has been delayed due to expired paperwork that the patient's conservator has to fill out. Unfortunately, The Springs has been unable to get in contact with the patient's conservator for paperwork and payment for patient's long term care. Patient changed to intermediate status and transferred to Team E to assume care 05/23/23." "SW called and spoke with Megan at The Springs about admission paperwork/financials. Megan reports the facility has tried to contact the pt. conservator Jessica about paperwork/financials but has not reached her."

- David spent an extra week in the hospital because Jessica Hyte was MIA.

| | |
|---|---|
| 5/23/23 | "Jessica asked the SW to notate that the pt. son Paul has no authority to make any decisions regarding the pt. Per Jessica, Paul is allowed to visit the pt. but no information about medical care decision should be discussed with the son."<br>• They disregarded the medical POA assigned by David and refused Paul any details about his health. They were not given that power by the court. |
| 5/24/23 | The patient's paperwork and payment were finally processed by the Springs of Avalon so that he could resume his care there. |
| 6/22/23 | Petition for Subsequent Conservator from Paul and Kim Sims. Provided explanations of accounting. Detailed Alice's behavior and how Gomes believed her lies. Revealed David's abuse at nursing home, which stopped once Paul reported it to the court. |
| 7/25/23 | Property Management Plan asked to evict Paul from both home and office. Listed monthly expenses of $350 for prescriptions, $300 for medical, and $250 for personal needs, all of which should be covered by VA and Medicare. |
| 8/3/23 | Hearing on Intervening Petition. Eldercare was allowed to go first. Five witnesses present for Paul, but none were acknowledged by the court.<br>• This was the first of several times that Paul's witnesses were banned from the courtroom by Gomes., in violation of Rule 2.6. |
| 9/6/23 | Second hearing. Eldercare again called first. Claimed David was $50,000 in debt, including medical bills that the VA should have covered., but were not required to show proof. Paul's witnesses still not heard. Gomes declared she did not care about Paul, then denied his petition "until the respondent's debts are paid off and he's in a better financial position." Ordered sale of Cooper property without seeing financial data. Ordered evaluation of Stonewall residence, insisting Eldercare perform the evaluation despite Paul's protests, mocking him in court. |
| 9/29/23 | Because Paul had to cancel the house evaluation appointment to take his daughter to the doctor, Eldercare went to Arkansas, where they didn't have jurisdiction, and moved David to Brightmore in Memphis. |
| 10/6/23 | Eldercare filed Petition for Injunctive Relief over Environmental court case, begged to sell the house on Stonewall. |
| 10/16/23 | Environmental court hearing about fence at commercial property. |
| 10/17/23 | Status Conference. Gomes ordered Paul to remove his dogs from the office, and allow Eldercare to assess both properties, with the promise to move David back into the home if found acceptable. |
| 10/27/23 | Stonewall evaluation performed by Eldercare. |
| 10/30/23 | Amended Property Management Plan listed monthly expenses of $500 for incontinence items, which are covered by VA. Also contained a "spend down plan" including the sale |

of both properties and David remaining in the nursing home until he died, with Eldercare in charge, which countered what Gomes had said in the status conference. And Eldercare threatened legal action against Paul for the fence.

| | |
|---|---|
| 11/1/23 | Eldercare filed Assessment Report on Stonewall.<br>They agreed the house was suitable with a few minor changes, but they did not want to move David back into the home because they did not want to deal with Paul. However, there was no need for them to deal with Paul, because once the office was sold and the finances were resolved, ElderCare was not needed as conservator. Paul could have taken care of David in the home without any outside interference. |
| 11/1/23 | Paul filed Motion for Recusal. Marjorie Baker stated to Paul, "We were told that you might be a problem." |
| 11/3/23 | Gomes dismissed Motion for Recusal for not following rules.<br>• Gomes did not respond to any of the allegations, simply stating that the attorney did not use required language. |
| 11/16/23 | Eldercare filed Initial 6 Month Accounting. |
| 11/16/23 | Second Motion for Recusal. |
| 11/17/23 | Gomes dismissed Motion for Recusal for not following rules.<br>• Again, Gomes did not respond to anything in the motion. |
| 11/17/23 | Motion for Interlocutory Appeal. |
| 11/27/23 | Eldercare filed Opposition Response to the Interlocutory Appeal. |
| 12/4/23 | Eldercare claimed David had no money and was $80,000 in debt, not including lawyer and conservator fees. The debt they created was used as reasoning to sell the office. |
| 12/4/23 | Response to Petition for Injunctive Relief. |
| 12/4/23 | Objection to Property Management Plan. |
| 12/5/23 | Appraisal of office for $290,000. |
| 12/6/23 | Office listed for sale for $329,000.<br>• Listed online only, for a very short time, no physical sign to promote sale of prime location. |
| 12/11/23 | Approved Property Management Plan. |
| 12/18/2023 | Gomes stated in hearing regarding the Motion for Interlocutory Appeal, "If I grant this, I have to file something saying I was wrong." A few minutes later she repeated, "I'd have to say I was wrong." |

12/20/23 Denied Interlocutory Appeal. Once again, for not following the rules.

12/28/23 Petition to Approve Sale.

1/24/24 Response Opposing Sale.

1/24/24 Paul filed lien on office.

1/25/24 Bucky filed accounting day of court. Still incorrect numbers, saying Paul spent $139k when he actually spent $30k.

- Bucky previously said to Paul's attorney, Ms. Akines, that he had a personal problem with Paul.

1/25/24 Hearing. Gomes kicked out all of Paul's witnesses again.

- A witness with Eldercare was allowed to remain in the court.

1/29/24 Lien withdrawn.

2/1/24 Order Granting Petition to Approve Sale of office.

2/6/24 Eldercare asked Paul to deliver wheelchair to Brightmore through email.

2/8/24 Eldercare paid about $30K at once in back taxes, disrupting the historic payment plan and creating financial emergency.

2/16/24 Eldercare emailed Tommy Baker, director at Brightmore, about visitation.

2/16/24 Paul and John Dolan (Paul's attorney and friend) prohibited from visiting David at Brightmore by Tommy Baker.

- Tommy Baker told Paul he got a call from Jennifer Hyte saying that they couldn't visit. Then he backtracked and said it was an email from Jessica, only banning John Dolan.

3/5/24 PACT Act mad David automatically eligible for VA services.

- These benefits had already been applied for and approved, but ElderCare had failed to use them.

3/6/24 Petition for Fees for Eldercare and attorneys.

3/12/24 Motion to Terminate Conservatorship.

3/20/24 Eldercare called and emailed Tommy Baker at Brightmore, clarifying visitation restriction was only for John Dolan.

4/3/24 Hearing on Exceptions to Accounting.

4/9/24 Order Confirming Accounting and Setting Fees.

| | |
|---|---|
| 4/24/24 | Paul banned from visiting David again. Tommy Baker, director of Brightmore, hits Paul with the door. |
| 4/26/24 | Motion to pay attorneys. Paul and counsel were not notified of hearing. |
| 5/7/24 | Order approving attorneys paid. Gomes handwrote in the order that Paul's attorney did not appear or object, even though he was never notified. Gomes falsified the document stating "upon notice to Randall Songstad, attorney for Paul Milem." Mr. Songstad stated he was never given notice. The attorneys only discussed dates, and this specific date was unacceptable, as he would be out of town. Ms. Akines was not notified at all. On the "Certificate of Service," Scott Vincent did not sign acknowledging it was sent to Paul's counsel. |
| 5/17/24 | Motion to Set Aside Order granting fees filed by Randy Songstad<br>• Motion never addressed in court. |
| 7/24/24 | Scott Vincent put in "Notice of Appearance" under new firm, so Eldercare had attorneys from two firms representing them, doubling the costs. |
| 12/10/24 | ElderCare renewed conservatorship bond for only $70,000, when the estate is worth multiple times more. |
| 12/12/24 | Accounting filed shows ElderCare spent $364,247.43 in eleven months (11/1/23-10/3/24). |
| 2/4/25 | David admitted to Germantown Methodist Hospital for fever, blood pressure, and lethargy. Elder Care hired 24/7 bedside sitters for David. |
| 2/5/25 | Paul visited David in hospital. David was able to sit up, feed himself, and communicate. All vital signs normal. |
| 2/7/25 | David returned to Summit of Germantown. |
| 2/9/25 | Bedside sitter complained to Paul that David was neglected at Summit. |
| 2/10/25 | David moved to Jordan River, still with 24/7 bedside sitters. This is the most expensive nursing home in the Memphis area, at around $13,000 per month. |
| 2/11/25 | Adult Protective Services visited David at Jordan River for negligence complaints, first of several visits. |
| 2/11/25 | Paul visited David at Jordan River. David was apparently sedated, unable to open his eyes or communicate. Unable to feed himself. Slept all day according to bedside sitter. This was new behavior since he moved to Jordan River. |
| 3/10/25 | David admitted to Baptist East for four days for dehydration. |

| | |
|---|---|
| 3/28/25 | ElderCare and attorneys petitioned for fees. |
| 3/31/25 | David admitted to Baptist East again. |
| 4/8/25 | David transferred from second to first floor at Jordan River. |
| 4/11/25 | Bedside sitters cut back to twelve hours per day. |
| 4/26/25 | Bedside sitters no longer used. Their presence was never explained, nor why they were not necessary anymore. |
| 5/14/25 | Court hearing to approve payments to Eldercare and their attorneys. Paul ordered to pay for home assessment and to begin paying the Stonewall mortgage. Gomes again insisted that Eldercare perform the assessment, including the entire residence, even though David Milem is bedridden. Randy Songstad met with Gomes and ElderCare attorneys in chambers before court, falsely telling the judge that Paul agreed to pay the mortgage and for the home assessment. |
| 5/22/25 | David Milem was moved to The Waters of Memphis because, according to Eldercare, this nursing home is cheaper and Medicare/VA compliant. The facility cost over $11,000 per month. |
| 6/10/25 | Phone call with Randy Songstad, when he told Paul that he can't possibly win, for the first time ever. |
| 6/11/25 | Randy Songstad emailed Paul, admonishing him to pay the mortgage and assessment cost. |
| 6/13/25 | Paul texted Randy asking for the assessment cost, but received no response. |
| 7/3/25 | Paul texted Randy asking for him to do anything. |
| 7/15/25 | Randy emailed Paul a response, withdrawing as his counsel. Then Randy emailed and called opposing counsel, who immediately started on a petition to hold Paul in contempt. Randy informed them about Paul's Board complaint against him. |
| 7/23/25 | Paul went to visit David, who had been moved without notification. Texted Randy asking where he was. |
| 7/24/25 | Randy texted to inform Paul that David had been moved to the Oxford VA Home. |
| 8/11/25 | ElderCare filed motion to allow the estate to pay the mortgage because Paul had not. |
| 8/12/25 | ElderCare petitioned to sell David Milem's home and to hold Paul in contempt. |
| 8/19/25 | ElderCare had hearing without notifying Paul. |
| 9/15/25 | ElderCare had hearing without notifying Paul again, leading to order to sell David's home and evict Paul and his family. |
| 9/23/25 | Randy Songstad finally filed a motion to withdraw as Paul's counsel. |

| | |
|---|---|
| 9/25/25 | Gomes ordered Songstad's withdrawal. No hearing mentioned in the order. |
| 10/30/25 | David Milem passed away. ElderCare only notified Paul of his deteriorating condition the day before. |
| 11/4/25 | ElderCare and attorneys filed Final Accounting. |
| 11/25/25 | ElderCare and attorneys petitioned for fees. They withdrew all remaining funds from the bank accounts of David Milem after his death to pay themselves. |
| 1/7/26 | Zoom meeting to set fees of over $20,000. Juliet Akines moved to withdraw as Paul's counsel. |
| 2/19/26 | Hearing and Order to allow Juliet Akines to withdraw as Paul's counsel. Paul was not notified of the hearing. |
| 2/26/26 | Paul files Motion to Set Aside Void Order. |
| 3/12/26 | Ed Autry petitions to open estate and be administrator. |
| 3/25/26 | Hearing on Petition to Open Estate. Gomes resets to allow Paul to find an attorney. |
| 3/26/26 | Order scheduling hearing on opening the estate |
| 4/1/26 | Paul emailed Marjorie Baker requesting bill and offering to make payments. |
| 4/2/26 | Final Accounting showed that ElderCare and their attorneys paid themselves from David Milem's bank accounts after his death, ignoring § 34-3-108 and defying the order from Gomes that "payment is reserved at this time pending further order of the court." |
| 4/6/26 | Ed Autry emailed Paul in reply, requesting that all communication go through him. He stated their firm was owed $27,500 and ElderCare was owed $3,444.72. He agreed to drop his petition if Paul paid both balances in full by 4/10 at 5:00 pm and dismissed with prejudice his Motion to Set Aside Void Order. |
| 4/14/26 | Paul filed Counter Petition to Administer Estate. |
| 4/14/26 | Hearing on Petition to Open Estate.<br>• Gomes admitted that Paul had priority, if he could get bonded. Ed Autry accused Paul of stealing from the estate and insisted he be bonded for double the amount. Paul called the bonding company and was refused because Judge Gomes and Ed Autry had called requesting they not give him the bond.<br>• Paul called Polly Agee, of the bonding company, and she admitted Gomes and Autry had contacted her. She then emailed the judge and probate personnel repeating this. |
| 4/15/26 | Paul bonded by a different company for the higher amount. |
| 4/28/26 | Notice of Hearing on Exceptions to Accounting in Conservatorship Case.<br>• Paul sent a court reporter to the hearing. She set up in the courtroom and waited for over an hour, only to find that the hearing was cancelled. However, she saw the attorneys for ElderCare coming out of Judge Gomes's chambers, and she heard Gomes tell other attorneys not to work for Paul. |

| | |
|---|---|
| 5/1/26 | Paul's new attorney, Luke Sanderson, filed Motion for Status Conference, hoping to have Gomes insist that Ed Autry not interfere. Autry did not respond to his request for a hearing date. |
| 5/7/26 | Ed Autry appointed Administrator of Estate, despite Gomes's assurance that Paul would be appointed if bonded, and despite the request for a hearing. |
| 5/8/26 | Ed Autry posted a Notice to Creditors. |
| 5/11/26 | Scott Vincent filed claim for almost $20k. |
| 5/18/26 | Paul filed Motion to Remove Ed Autry as Administrator. No hearing set. |
| 5/19/26 | ElderCare filed claim against estate for over $3k. |
| 5/19/26 | Marjorie Baker filed claim against estate for over $21k. |
| 5/19/26 | Ed Autry filed a Petition to Recover Funds, claiming that Paul took money that belonged to the estate. However, the money is for rental of farmland in Missouri.<br>• Property in another state does not fall under the jurisdiction of a TN probate court.<br>• Real property automatically vests to the heir upon death, and is only part of the estate if the court allows it to be brought in.<br>• Paul created a new contract with the renters in January, 2026, after David's death and before the estate was opened.<br>• Paul used the money to pay the mortgage on the Stonewall house, preserving the assets of the estate. |
| 5/19/26 | Ed Autry filed a Motion to Bring Real Property into Probate Estate, claiming the only asset left in the estate was the Stonewall residence (countering his claims in the petition filed the same day), and asking that the house be sold in order to pay his own firm. |
| 5/22/26 | Hearing Set for Exceptions to Accounting. Court Reporter present, but Judge Gomes never appeared. Order Confirming Accounting created during Ex parte communication, discharging the bond and waiving all future accountings, even though a motion is still open. |
| 6/11/26 | Ed Autry served David Woolfolk, Paul's mentor, demanding he return the entire farm rent check or have a judgment against him in that amount (over $60k.) Dave was simply helping Paul manage the funds and pay the mortgage. |
| 8/6/26 | Hearing on Paul's Motion to Remove Autry. Gomes started by allowing Luke Sanderson to withdraw as counsel, leaving Paul without representation. She refused to listen to Paul on the stand, when he repeatedly told her he was bonded. She denied his motion to replace Autry "because he could not get bonded." |
| 8/27/26 | Gomes denied Paul's Motion to Remove Autry, punishing him for filing legitimate exceptions to claims and claiming he is "at odds with the fiduciary duties." |
| 9/1/26 | Hearing on Motion to Bring in Real Property. Gomes refused a continuance requested by Paul. Gomes approved the sale of the house, ignoring over $100,000 available from a previous judgment that would cover all debts. |

Statement of Material Harm: Estate of David William Milem

1. Invalidity of Initial Appointments

The foundation of this conservatorship was procedurally invalid from its inception, beginning with the appointment of the ex-wife instead of the son. By bypassing established statutory priorities for family members and ignoring the ward's existing, functioning Advanced Directives and powers of attorney, the court failed to adhere to the "least restrictive alternative" standard required by law. The court subsequently appointed ElderCare sua sponte without the filing of a proper petition, thereby circumventing mandatory notice requirements and depriving the next-of-kin of their right to contest the proceedings. These procedural failures enabled a fiduciary relationship that prioritized professional billable hours over the ward's existing, cost-free support systems.

2. Financial Devastation and Misappropriation

Because the foundational appointment was procedurally invalid, the subsequent depletion of the estate was not only a breach of fiduciary duty but an unauthorized exercise of control over the ward's assets. The conservatorship transitioned the ward's estate from a state of sustainable financial health to insolvency through a pattern of unnecessary and high-cost professional services. Funds were intentionally diverted to pay for private-pay medical services despite the ward's clear eligibility for cost-free VA care.

3. Breach of Fiduciary Duty and Self-Dealing

The appointed conservator (ElderCare) and counsel (Harkavy McDaniel Kaplan & Salomon P.C.; Allen, Summers & Gresham, PLLC; et al.) systematically prioritized the extraction of legal and administrative fees over the ward's welfare and the preservation of his assets. The sale of the ward's office property, and the current attempts to force the sale of his residence, were driven not by the needs of the ward, but by the demand of the appointed professionals to satisfy their own billing requirements. The estate administrator attempted a conversion of non-probate assets, petitioning to seize assets in Missouri outside of the court's jurisdiction to pay his own firm's fees. The administrator also attempted to extort the next-of-kin into a settlement of said fees in exchange for dropping a petition. Furthermore, estate funds were depleted through unauthorized withdrawals made by the conservator and counsel after the ward's death. The court did not grant the conservators the legal authority to unilaterally seize and convert estate assets.

4. Judicial Impropriety and Violation of Due Process

The integrity of the court proceedings has been compromised by recurring ex parte communications between the judge and counsel, creating orders through these communications

while hearings were officially cancelled. The ward's rightful next-of-kin was systematically excluded from the process without legal justification, denied notice of hearings, and prohibited from presenting witnesses. The court further interfered with the estate's administration by actively obstructing the bonding process for the rightful heir, a deliberate deprivation of the heir's statutory right to serve.

5. Deprivation of Rights and Quality of Life

The ward was subjected to unnecessary medical interventions, forced transfers between facilities, and the denial of visitation from his primary caregiver and family. These actions were taken by individuals who had never consulted with the ward's physicians or long-term care partners, demonstrating a callous disregard for the ward's expressed wishes and established Power of Attorney and Advanced Directives.

VIII. Unlawful Seizure and Extraterritorial Conversion of Missouri Farmland Rents

The records demonstrate that Judge Gomes consistently exceeded her territorial jurisdiction by tracking, seizing, and attempting to liquidate the income generated by real property located outside the State of Tennessee, specifically agricultural parcels in New Madrid County and Pemiscot County, Missouri.

The Misconduct: In her initial order on Mar 23, 2023, Judge Gomes authorized ElderCare to take control of the Missouri farm proceeds. On Jan 24, 2024, ElderCare intercepted $62,856.00 in Missouri farm rent. Rather than utilizing these funds to sustain the ward's estate or maintain his Memphis properties, Judge Gomes permitted the immediate diversion of this $62,856.00 chunk to pay down the legal billings of her preferred attorneys. Following the ward's death on Oct 29, 2025, when all conservatorship powers legally ceased, the 2026 farm rent check was issued. Because Complainant directed the tenant to pay this rent to his mentor who helps him manage funds, Judge Gomes allowed her public administrator (Edward T. Autry) to file a retaliatory petition on May 19, 2026.

The Infraction: Judge Gomes used her bench to issue cross-border orders demanding the return of the Missouri funds under threat of civil and criminal contempt, despite lacking in-rem jurisdiction over Missouri land or its agricultural outputs. This aggressive pursuit of out-of-state funds to satisfy local attorney liens violates Rule 1.1 (Compliance with the Law) and Rule 2.2 (Fairness and Impartiality).

IX. Failure to Supervise: Total Abdication of Fiduciary Oversight and Ratification of Pre-Death Cash-Outs

The record establishes that Judge Gomes completely abdicated her mandatory supervisory duties over the fiduciaries she appointed sua sponte. On May 22, 2026, Judge Gomes signed an order confirming ElderCare's Final Accounting despite a glaring, fraudulent timeline.

The Misconduct: The approved ledger explicitly showed that between October 24 and October 28, 2025, the fiduciaries disbursed thousands of dollars to themselves and their attorneys for fees that Judge Gomes had explicitly reserved and had not yet legally approved.

Unauthorized Post-Death Withdrawals: The court failed to supervise fiduciaries who continued to unilaterally seize, transfer, and convert estate assets via unauthorized bank withdrawals (such as payouts to fiduciaries on Jan 07, 2026, and Feb 26, 2026) well after the ward had passed away.

The Infraction: By rubber-stamping an accounting that transparently documented fiduciaries raiding a dying ward's bank account and continuing to pay themselves from the frozen accounts after the conservatorship was terminated to avoid the estate claims process, Judge Gomes

actively insulated her preferred network from accountability. This wholesale failure to police blatant self-dealing violates Rule 1.1 (Compliance with the Law) and Rule 2.5 (Competence, Diligence, and Fairness).

X. Direct Ex Parte Sabotage of Fiduciary Administrator's Bond and Defiance of Procedural Due Process

Following the ward's death on Oct 29, 2025, Complainant sought to be appointed Administrator of his father's estate. On Apr 14, 2026, Complainant successfully qualified for a $60,000.00 Administrator's Bond through Douglas & Greer, Inc., the probate court's preferred bonding company.

The Misconduct: Upon learning that Complainant had placed the Missouri crop proceeds into the care of his trusted mentor to help him manage the funds, Judge Gomes summarily doubled the bond requirement to $120,000.00. She concluded the hearing with a verbal order stating that Complainant would be appointed Administrator contingent upon his securing a bond for the increased amount.

The Transcript: Judge Gomes: "Well, you know, and this is always, and let me just be candid with you. My problem with a lot, not just Mr. Milem, but when sometimes when people are the sole heirs, they feel like they can just take it all. I mean, and this is not just him, this is other people. And that's why I'm always concerned with a sole heir, especially a sole heir that's out of state. And that's why I usually bond them anyway because the concern is always that they feel it's their money and then they just leave with it and they don't come back. And that's why I always make people bonded…

"Well, let me just say this. I am reluctant to appoint him under these circumstances…

"So here's the deal. You see if he's bondable for 120,000. I'm very upset as to what happened. But now we have an idea. So he's either bondable for 120,000 or I'm appointing Mr. Autry…

"So it looks like we're going to appoint him with a 120 bond and then you can file all your claims. Okay?"

The Action: To ensure the estate remained under the control of her preferred public administrator (Edward T. Autry, whose firms represents the adverse fiduciary, ElderCare), Judge Gomes participated in unrecorded ex parte communications with the commercial bonding agent, Polly Agee of Douglas & Greer, Inc.

The Evidence: In a recorded phone call, the bonding underwriter explicitly admitted to the ex parte pressure, stating to Complainant: "I spoke to both the attorney, another attorney, and the judge on this, and after hearing information that went on... it's just not something that I in good faith can do... I'm just sorry my hands are tied at this point. I'm just not able to do it."

The Structural Deception: Despite this orchestrated interference, Complainant successfully bypassed the local obstruction and qualified for the full $120,000.00 Administrator's Bond

through Western Surety Company on Apr 15, 2026. Complainant's counsel immediately filed a Motion for Status Conference on May 01, 2026, to present the valid bond to the court and finalize the appointment. Judge Gomes entirely ignored the pending motion, bypassed the scheduled conference, and on May 07, 2026, signed an order falsely finding that Complainant "failed to qualify for the... Administrator's Bond," using that pretext to hand the estate to Edward T. Autry without a hearing.

The Infraction: Utilizing the power of the bench to execute back-channel interference with a private business to actively destroy a litigant's statutory qualification is a severe violation of Rule 2.9 (Ex Parte Communications) and Rule 2.3 (Bias and Prejudice). Furthermore, entering a final order that purposefully ignores a pending motion and misrepresents a litigant's bond status to bypass a mandatory hearing violates Rule 2.2 (Impartiality and Fairness) and Rule 2.6 (Ensuring the Right to be Heard). Failing to respect and comply with the law and act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary violates Rule 1.1 & 1.2 (Compliance with the Law and Promoting Confidence in the Judiciary).

## XI. Closed-Loop Self-Dealing and Bias

On August 27, 2026, Judge Kathleen N. Gomes entered an order formally denying Complainant's motion to remove Edward T. Autry as Personal Representative. The court's stated rationale provides explicit written documentation of systemic judicial bias and protection of fiduciary self-interest: the court ruled that because Complainant is the sole heir and filed lawful exceptions to verified claims, including claims submitted by Autry's own law firm (Harkavy, McDaniel, Kaplan & Salomon, P.C.), Complainant is supposedly "at odds with the fiduciary duties required for the administration of this estate."

The Misconduct: This ruling perverts basic probate law by punishing the sole beneficiary for executing his legal right and duty to challenge unverified or self-serving creditor claims. Rather than maintaining neutrality, the court weaponized the concept of "fiduciary duty" to lock out the rightful heir, shielding the administrator's own firm from accountability and ensuring that estate assets continue to be drained exclusively for the financial benefit of appointed counsel.

The Infraction: Using a circular logic to penalize the sole heir for challenging the administrator's law firm's fees by calling it a "conflict" violates Rule 2.2 (Impartiality and Fairness). In a case in which their impartiality might reasonably be questioned, such as when personal friendships or closed-loop economic ties dictate administrative rulings, a judge refusing to disqualify herself violates Rule 2.11 (Disqualification / Impartiality).

## XII. Institutional Exclusion and Violation of the Duty of Honest Services

The record indicates a recurring pattern where the court functioned not as an open, neutral tribunal, but as an insular system focused on generating professional fees to the total exclusion of the natural family and statutory priorities.

The Pattern: By entering sua sponte appointments without notice, holding fee hearings when opposing counsel was known to be out of town, and executing ex parte communications with private underwriting bondsmen to systematically block the sole heir from qualifying as administrator, the court engaged in patterns that mirror established definitions of a denial of "honest services" under Tennessee law.

The Infraction: A judge's core duty is to maintain absolute transparency and ensure that the courtroom machinery is never utilized to orchestrate the outcome of a case behind closed doors. Operating a probate division to actively insulate professional fiduciaries from adversarial testing while systematically draining an estate's real property and out-of-state crop rents represents a fundamental violation of Rule 1.2 (Promoting Confidence in the Judiciary) and Rule 2.2 (Impartiality and Fairness).

CONCLUSION AND PRAYER FOR INVESTIGATION

The records indicate that Judge Kathleen N. Gomes has abandoned the role of a neutral, detached magistrate. Her actions demonstrate a pattern of running an insular probate network that strips family members of notice, conducts unrepresented hearings, and engages in back-channel communications with private bondsmen to dictate case outcomes.

Complainant respectfully requests that the Board of Judicial Conduct launch a formal investigation into the actions of Judge Gomes in these consolidated matters to preserve the integrity of the Shelby County Probate Court.

Respectfully Submitted,

______________________________

Paul R. Milem, Complainant

# APPENDIX: EVIDENCE EXHIBIT TIMELINE

## Chronological Cross-Reference of Orders, Ex Parte Communications, and Financial Extractions

This appendix establishes a direct correlation between the substantive orders signed by Judge Kathleen N. Gomes, documented back-channel or ex parte communications, and the subsequent liquidation or extraction of the assets of David William Milem.

### 1. The Swapping of Fiduciaries and Initial Asset Freeze

Mar 23, 2023: Judge Gomes enters an order sua sponte removing Carolyn Alice Milem and appointing ElderCare Consultants, LLC ("E.C.C.") as Successor Conservator.

Factual Status: No notice or citation is served upon Paul Milem, the ward's sole heir and long-standing resident caregiver.

Financial Impact: E.C.C. assumes immediate possession and control of all income and properties, explicitly targeting Bank of America account ending 1970 containing $55,085.10 in liquid capital.

Apr 07, 2023: Armed with the sua sponte order, E.C.C. representatives arrive at 353 Stonewall Street accompanied by law enforcement officers to demand immediate physical entry into the home.

May 10, 2023: Judge Gomes enters an order denying Paul Milem's Motion to Alter or Amend Judgment. The order places immediate restrictions on Paul Milem, prohibiting him from moving the ward from any facility.

### 2. The Implementation of Private Facility Placement and Forced Real Estate Sales

Jul 25, 2023: E.C.C. files its initial Inventory and Proposed Property Management Plan.

The Plan: Documents the Bank of America balance of $55,085.10. It explicitly proposes the forced sale of the residential home at 353 Stonewall Street and the commercial real estate at 866 S. Cooper Street.

Aug 03, 2023 & Sep 06, 2023: Judge Gomes conducts consecutive hearings on Paul Milem's Intervening Petition for Appointment of Subsequent Conservator.

Judicial Behavior: Judge Gomes refuses to allow Paul Milem's medical witnesses (physicians) to testify regarding home placement. She immediately orders the commercial building at 866 S. Cooper Street to be listed for sale, despite testimony proving it housed an active family business and faced no threat of foreclosure.

Financial Impact: By Sep 06, 2023, the liquid cash of the ward had dropped from $55,085.10 to $4,522.00, while E.C.C. generated thousands in unaudited fees.

Dec 11, 2023: Judge Gomes enters the formal "Order Approving Property Management Plan". The order forces the placement of David W. Milem at Brightmore of East Memphis at a recurring monthly drain of $5,500.00 to $6,200.00. The order explicitly states the ward's family home on Stonewall may need to be sold to cover accelerating debts.

Feb. 10, 2025: Ward moved to Jordan River Nursing Home at a cost of almost $13,000 per month. Bedside sitters are inexplicably added around the clock for an extra $5000 per week, despite the dwindling assets, the family members petitioning relentlessly to care for him at home, and the free VA options. Under their care, ward was hospitalized twice for dehydration.

3. One-Sided Fee Approvals and Systemic Exclusion of Defense Counsel

Jan 25, 2024: Judge Gomes conducts a hearing on E.C.C.'s Petition to Approve Purchase and Sale Agreement for the Cooper Street Property.

Feb 01, 2024: Judge Gomes enters an order authorizing the sale of the commercial building for $350,000.00.

Apr 09, 2024: Judge Gomes signs an order confirming E.C.C.'s First Accounting and sets immediate legal fees for Williams McDaniel, PLLC at $64,281.67.

May 07, 2024: The Known Absence Hearing. Judge Gomes conducts a substantive hearing on the Motion to Release and Pay the Balance of Previously Approved Attorney Fees.

The Misconduct: The hearing occurs despite the court clerk and judge possessing a written conflict letter from Paul Milem's counsel, Randall N. Songstad, stating he was out of town. Judge Gomes signs the order releasing the remaining $24,281.67 directly out of the estate accounts and manually pens a line stating the attorney "did not appear or object," deliberately weaponizing the absence she forced.

Oct. 3, 2025: E.C.C. files accounting showing they spent $364,247.43 in eleven months.

4. Post-Death Extractions and the Back-Channel Elimination of the Fiduciary Bond

Oct. 27 and 28, 2025: The two days before the ward's death, E.C.C. frantically writes checks to themselves and their attorneys, despite those fees being reserved by Judge Gomes's order in June.

Oct 29, 2025: David William Milem passes away in Oxford, Mississippi. Under Tennessee law, the power of a conservator terminates instantly upon death, leaving the probate estate as the sole legal entity.

Jan 06, 2026: Fiduciary counsel files a final push for fees. Paul Milem registers a formal written objection detailing E.C.C.'s total failure to utilize the deceased ward's cost-free VA medical benefits, which caused the structural insolvency of the entire estate. Judge Gomes denies his objection and orders all fees requested by E.C.C and their attorneys.

Jan. 7, Feb. 26 and 28, 2026: E.C.C. empties the ward's bank account, writing over $8,000 in checks to themselves and their attorneys after termination of the conservatorship in violation of probate law and RPC 1.15 (Safekeeping Property).

Apr 10, 2026: Fiduciary counsel Marjorie Baker engages in direct email communications with Shelby County Probate Accountant Valencia Hunt and Clerk Donna Jones. The emails reveal an active effort to retroactively discharge or alter bond obligations nunc pro tunc back to Mar 23, 2026, working behind the scenes with underwriter Polly Agee to manipulate estate parameters.

Apr 14, 2026 (Mid-Day): Direct Ex Parte Contact. Judge Gomes speaks directly on an unrecorded telephone line with the commercial bonding agent (Polly Agee) regarding the facts of the open case file. The agent then speaks to Paul Milem, stating on a recorded line that her "hands are tied" because she cannot issue a bond after receiving explicit direct instructions from the Judge.

Apr 15, 2026: Paul Milem successfully qualifies for an Administrator's Bond in the amount of $120,000.00 through Western Surety Company to take control of his late father's estate.

May 07, 2026: Judge Gomes signs the "Order Opening Estate of Intestate Decedent and Appointment of Personal Representative". She explicitly appoints her preferred public fiduciary, Edward T. Autry, stating as her factual basis that Paul Milem "failed to qualify for the $120,000 Administrator's Bond as ordered by the Court."

May 18, 2026: Paul Milem moves to remove Ed Autry as Administrator, citing his ability to attain a bond for $120,000. The bond is attached to the motion.

August 27, 2026: Judge Gomes signs the "Order Denying Motion to Remove Edward T. Autry as Personal Representative," asserting that Paul Milem is at odd with the fiduciary duties" because he filed exceptions to claims.

## I. THE PATTERN OF COERCIVE FINANCIAL DEMANDS AND EXTORTIONATE SETTLEMENT CONDITIONS

David Milem passed away on October 29, 2025. Prior to his passing, he was a ward of the conservators ElderCare Consultants, LLC, who were represented by Marjorie Baker at Harkavy, McDaniel, Kaplan & Salomon, P.C. Edward Autry, another attorney at her firm and alleged creditor of the estate, petitioned on March 12, 2026 to open the estate and be appointed as Administrator.

The Misconduct: On April 6, 2026, Respondent Edward T. Autry utilized electronic mail to issue a coercive demand to Complainant, stating that he would withdraw his competing petition to administer the estate only if Plaintiff paid $27,500.00 directly to Autry's law firm and $3,444.72

to ElderCare Consultants, LLC, by a strict deadline of April 10, 2026, while simultaneously forcing Complainant to dismiss with prejudice his pending Rule 60.02 motion challenging unauthorized court orders. [Actual debt claimed by his firm is $21,230.63, not $27,500.]

When Complainant refused to capitulate to these unilateral demands, Respondent escalated the ultimatums. On August 18, 2026, he transmitted a formal "settlement offer" labeled under Tennessee Rule of Evidence 408, demanding that Complainant execute a total financial payout exceeding $44,000 across multiple line items, including payments to Harkavy, McDaniel, Kaplan & Salomon, P.C., Allen, Summers & Gresham, PLLC, and ElderCare Consultants, LLC, while forcing the immediate dismissal of pending legal motions, the withdrawal of challenges to void orders, and the execution of a broad "Hold Harmless and Indemnity Agreement" shielding the fiduciaries from accountability. Respondent demanded an additional $60,000 in fees for serving as Administrator for 3 months, while refusing to disclose his “privileged” billing invoice. This offer also came with a strict deadline before its withdrawal.

In the email attached to this settlement offer, Respondent threatened financial retaliation, warning “those fees and expenses will continue to increase as I continue to administer the Estate and address documents such as unfounded exceptions to claims filed by Paul Milem.” Respondent made a similar claim during an open court hearing on April 14, 2026 that Complainant’s Rule 60.02 motion would illicit “significant fees unless [Paul Milem] voluntarily dismisses it.”

The Infractions: RPC 8.4(a), (c) & (d) (Misconduct): Leveraging a court-appointment position to extract private financial payoffs and forcing the dismissal of active legal motions undermines the integrity of the judicial system.

RPC 1.7(a)(2) (Conflict of Interest): Leveraging a position as a prospective or acting fiduciary to demand that payments be funneled directly back to the attorney's own law firm creates an impermissible conflict between the lawyer's financial self-interest and their fiduciary duties to the estate. A lawyer's personal financial interest cannot be made a mandatory prerequisite or "quid pro quo" condition for assuming a neutral fiduciary role like estate administrator.

RPC 1.8(h)(1) (Conflict of Interest): Requiring the sole heir and rightful appointee to execute a Release, Hold Harmless & Indemnity Agreement in order to recover his statutory rights limits the liability of malpractice to the estate.

RPC 4.4(a) (Respect for Rights of Third Persons): Issuing strict, high-pressure ultimatums with immediate deadlines to force an unrepresented or opposing heir to forfeit procedural rights, drop motions, and sign broad indemnities violates this duty.

RPC 1.5 (Fees): Demanding $60,000 in fees and expenses without submitting an accounting to the court or divulging an invoice to the heir precludes the determination of reasonableness.

II. MATERIAL MISREPRESENTATIONS TO THE TRIBUNAL

The Misconduct: In his official filings to open the estate, Respondent Autry formally alleged that the annual income for which he would be accountable as personal representative was "zero," while simultaneously actively pursuing and litigating the recovery of over $60,000 in annual Missouri agricultural crop rents and estate assets, violating his duty of candor to the tribunal.

The Infractions: RPC 3.3 (Candor Toward the Tribunal) and RPC 4.1 (Truthfulness in Statements to Others): A lawyer shall not knowingly make a false statement of material fact or law to a tribunal or in the course of representing a client. Claiming an estate has "zero income" on an official court petition while simultaneously aggressively pursuing tens of thousands of dollars in Missouri farm rents is a material misrepresentation to the court and parties.

III. INTENTIONAL ESTATE DEPLETION, EXTRATERRITORIAL SEIZURE, AND ASSET MISAPPROPRIATION

The Misconduct: By operation of Tennessee law, a conservatorship terminates instantly upon the death of the ward. All authority to execute non-emergency transactions, account sweeps, or account closures drops away. Months after the death of David Milem, the conservatorship fiduciaries and their attorneys emptied the remaining balances of both the Bank of America and Paragon Bank accounts to pay themselves over $8,000 without getting an estate administration order. This directly depleted the estate, leaving it insolvent. Under Tennessee law, all property instantly vested in the estate at death, rendering these unilateral post-death banking operations an unauthorized conversion of estate assets.

During the court hearing on April 14, 2026, Respondent questioned Complainant about the $62,856.00 annual Missouri crop rents, which he expected to use to satisfy outstanding attorney fees. Under Missouri Revised Statute 490.370, an Affidavit of Heirship allows real property to completely bypass probate estate. Complainant filed this affidavit, vesting the Missouri farmland to him immediately. He created a new lease with the farmers, asking them to send the check to his mentor/agent who would help him manage the funds.

When Respondent learned of this, he declared, "Your Honor, he's converted assets belonging to the estate that disqualifies him from serving… That's a crime. He just confessed to it on the stand." Conversely, Respondent's active pursuit of the farm rent violates the

fundamental limits of territorial jurisdiction. When local fiduciaries look to extract assets outside the boundaries of their state's jurisdiction without secondary ancillary administration, courts treat these maneuvers as explicit badges of active conversion. Respondent brought extraneous, false, and non-jurisdictional issues into the courtroom, using them to denounce the sole heir and secure his own appointment.

After his appointment, Respondent petitioned to recover the $62,856 funds and brought suit against Complainant's mentor on May 19, 2026. On the same day, he filed a motion to bring real property into the estate, namely the house at 353 Stonewall. Although Respondent expected to recover the farm rent, which would have covered the estate's debts, he claimed in his motion that "Petitioner is aware of no assets, other than the estate's interest in the subject real property, from which the Administrator can pay the aforementioned claims."

In his Objection to Bringing Real Estate into the Estate, filed August 31, 2026, Complainant attested, "David Milem has a standing judgment for over $100,000 that ElderCare never pursued and of which the appointed Administrator has knowledge. Collecting this judgment could pay any and all debts of the deceased, negating the necessity to bring real property into the estate." In the hearing on September 1, 2026, Judge Gomes asked Respondent if he was aware of this judgment, to which he replied he was, contradicting his claim in his motion and in court that he was aware of no other assets. He then continued to disregard the judgment money and argue to bring the house into the estate. The judge approved his motion.

Under Tennessee law, a fiduciary is bound by strict duties of loyalty and prudence to protect and conserve estate assets for the beneficiaries. Intentionally liquidating primary real property and non-replaceable assets when existing assets and judgments are more than sufficient to cover all claims serves no valid estate purpose other than generating extra administrative overhead, professional fees, and billable hours for the attorneys involved, denoting a breach of fiduciary duty.

During the September 1st hearing, Respondent also stated that he has hired counsel in Missouri to pursue the farm rents through those courts. Real estate is strictly governed by the laws of the state where the land physically sits. A Tennessee probate court and its appointed Administrator do not have direct, unilateral power to rewrite land titles or seize real property located in another state without opening proper ancillary proceedings there. If the real property successfully bypassed probate under local law, an Administrator must challenge that transfer in the foreign jurisdiction. Spending estate funds to hire out-of-state counsel to attack a completed land transfer does not benefit the estate or protect creditors. Instead, it serves primarily to generate cross-border litigation, procedural friction, and additional billable hours for the attorneys involved.

With just under $50,000 in current claims and the green light to sell the family home, worth approximately $700,000, plus the uncollected six-figure judgment, Respondent has already appropriated the assets necessary to pay the estate's debts. Any attorney fees and costs

charged to an estate must meet a standard of reasonableness and necessity. If an administrator initiates cross-border legal actions or hires outside counsel to aggressively chase assets that have already legally vested elsewhere, and does so when local estate funds are already more than sufficient to cover all valid debts and claims, those expenses are unreasonable, imprudent, and unnecessarily draining on the estate.

The Infractions: RPC 8.4(c) & (d) (Misconduct - Dishonesty, Fraud, Deceit, or Prejudicial Conduct): Emptying bank accounts months after a conservatorship has legally terminated upon death to pay attorney fees without a court-authorized estate administration order constitutes unauthorized conversion and self-dealing. Using a fiduciary position to misappropriate or prematurely drain funds involves deceptive and dishonest handling of funds, which is fundamentally prejudicial to the administration of justice.

RPC 3.3(a) (Candor Toward the Tribunal): Telling a judge in a formal court motion that "Petitioner is aware of no assets, other than the estate's interest in the subject real property" while simultaneously pursuing and seeking to recover $62,856.00 in Missouri crop rents misleads the tribunal regarding the actual asset inventory and financial liquidity of the estate.

RPC 3.4 (e): (Fairness to Opposing Party & Counsel) and RPC 3.1 (Meritorious Claims and Contentions): Accusing a party on the record of a "crime" for handling out-of-state property via an Affidavit of Heirship (which lawfully bypasses probate under Missouri law) while simultaneously attempting to assert extraterritorial control over those same out-of-state funds constitutes bringing unsupported, extraneous, and non-jurisdictional positions into a proceeding merely to harass or gain leverage.

RPC 1.7 & 1.8 (Conflict of Interest / Prohibited Transactions): Prioritizing the immediate self-liquidation of bank accounts to satisfy internal law firm and administrative fee balances, rather than preserving estate assets neutrally for beneficiaries and creditors, creates an impermissible conflict between the attorney's financial self-interest and their professional duties.

RPC 4.4(a) (Respect for Rights of Third Persons): Leveraging ungrounded legal accusations in open court ("That's a crime. He just confessed to it on the stand.") to intimidate a beneficiary and improperly seize control of assets outside the court's territorial jurisdiction violates the duty to respect the legal rights of others without a substantial purpose other than to burden or coerce.

RPC 4.1: (Truthfulness in Statements to Others) Claiming that Missouri farm rent "properly belongs to the Estate" when the land has legally vested to the heir violates the standard of truthfulness.

## IV. ACTIVE INTERFERENCE WITH THE FIDUCIARY BONDING PROCESS AND EX PARTE ORCHESTRATION

Following the death of David Milem, Complainant petitioned to be appointed Administrator of the Estate. In the hearing on April 14, 2026, Judge Gomes agreed to appoint him if he was bondable for $50,000. After the bond was approved, Respondent questioned Complainant about the farm rent from Missouri. Complainant explained the land vested to him and he entered a new agreement with the farmers, naming his mentor and agent as the holder of the funds. Respondent wrongfully accused him of confessing to a crime and demanded that the judge raise the bond to $120,000. The higher bond was approved and court was adjourned with the verbal appointment of Respondent as Administrator.

The Misconduct: To block the legal heir from taking control of the estate assets and to protect his firm's financial control over the estate, Respondent engaged in an unrecorded, back-channel alignment with the probate judge and private bonding underwriter Polly Agee of Douglas & Greer, Inc. Audio and telephonic transcript records capture the bonding underwriter stating her "hands are tied" and she was forced to rescind the bond solely because she had been contacted directly by the estate attorney and communicated with the judge.

After successfully orchestrating the collapse of Complainant's bond behind closed doors, Respondent submitted a formal "Order Opening Estate" on May 7, 2026 stating that because Paul Milem "failed to qualify for the $120,000 Administrator's Bond... it is appropriate that Edward T. Autry be appointed."

The Infractions: RPC 3.5 (Impartiality and Decorum of the Tribunal) & RPC 8.4 (Misconduct): Coordinated extrajudicial pressure and deceit stripped a sole heir of his statutory rights. Utilizing ex parte access to the judiciary to intentionally lock out family members, suppress next-of-kin participation, or systematically dismantle an heir's ability to qualify for administration crosses the line from zealous advocacy into official oppression.

RPC 3.3 (Candor toward the Tribunal) & RPC 3.4 (Fairness to Opposing Party): Presenting an order based on a failure that Respondent personally engineered is a profound exploitation of the judicial machinery.

## V. CLOSED-LOOP SELF-DEALING AND BIAS

The Misconduct: On August 27, 2026, Respondent authored an order formally denying Complainant's Motion to Remove Edward T. Autry as Personal Representative. The court ruled that because Complainant is the sole heir and filed lawful exceptions to verified claims,

**WHEREFORE, PLAINTIFF RESPECTFULLY PRAYS:**

1. That the decisions of the Defendant Judge Gomes be reversed and that the Plaintiff be awarded all funds awarded to Elder Care and their Attorneys and rescind the Order entered finding the Plaintiff in Civil and Criminal Contempt and the Sale of the Plaintiffs fathers' Home and the Appointment of Edward Autry as Administrator.

2. In the alternative, that the decisions of the Defendant Judge Gomes be deemed null and void in relation the David Milem case # PR015356 in Shelby County Probate Court and any orders entered after his death

3. For such other relief as may be just and proper under the circumstances.

Dated: 11/10/2027

**Respectfully submitted,**

Paul Milem

**Paul Milem**
Pro-Se Plaintiff
353 Stonewall
Memphis, TN 38112
(901) 340-1249

**AFFIDAVIT OF SERVICE**